773 F.2d 932
 120 L.R.R.M. (BNA) 2774, 103 Lab.Cas. P 11,646
 James BASSETT, Aaron Kesner, and David Waszkowski,
Plaintiffs-Appellants,
v.
LOCAL UNION NO. 705, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,
Defendant-Appellee.
 No. 84-2677.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 11, 1985.
Decided Sept. 30, 1985.
 
 Mark S. Stein, Potter, Schaffner & Stein, Chicago, Ill., for plaintiffs-appellants.
 David Mathews, Carmell, Charone & Widmer, Ltd., Chicago, Ill., for defendant-appellee.
 Before CUMMINGS, Chief Judge, FLAUM, Circuit Judge, and PECK, Senior Circuit Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 Plaintiffs appeal from the district court's dismissal of their suit brought under section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1982), against defendant Local Union No. 705 of the International Brotherhood of Teamsters ("Local 705") for breach of its duty of fair representation in the processing of plaintiffs' grievances against their former employer, Glendenning Motorways, Inc. ("Glendenning"). The district court granted summary judgment to the defendant and dismissed the action solely on the ground that plaintiffs had failed to exhaust internal union remedies. Because we conclude that the internal remedies provided by the Teamsters Union were inadequate either to "reactivate" the plaintiffs' grievances or to award them the full relief they seek in this case under the principles enunciated by the Supreme Court in Clayton v. International Union, UAW, 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981), we reverse and remand for further proceedings.
 
 I.
 
 2
 During the relevant events giving rise to this action, the plaintiffs were employed as truck drivers for Glendenning, an interstate trucking firm, and were members of Local 705. Glendenning and Local 705 were parties to a collective-bargaining agreement known as the Joint Area Cartage Agreement (the "JACA"). This agreement created a procedure for adjudicating employee grievances under which such grievances would be conclusively decided by a Joint Grievance Committee ("JGC") composed of both Local 705 officials and employer representatives. Although decisions of the JGC that are reached by majority vote are considered final and binding, the JACA states that if the JGC deadlocks on a particular issue, both union and employer are entitled to resort to all lawful economic or legal recourse as to that issue. In concrete terms, this provision allows the union after a JGC deadlock to sue or to call a strike against the employer.
 
 
 3
 The JACA also places substantial limitations on the employer's power to subcontract work to other firms. Nevertheless, in 1981 Glendenning began subcontracting certain work to a company called Metro Distribution, Inc. ("Metro"). A dispute over the propriety of this subcontracting gave rise to the present case. When plaintiffs Bassett and Waszkowski and others were laid off by Glendenning in October 1981, purportedly because of a lack of work, they filed grievances pursuant to the JACA challenging Glendenning's subcontracting of work to Metro. Local 705 processed these grievances to the JGC, which in turn issued a decision on November 18, 1981 referring the matter back to the parties for settlement. Representatives of Local 705 and Glendenning reached an agreement on the subcontracting issue in February 1982 that entailed, among other things, Glendenning's payment of backpay to two drivers other than the plaintiffs.
 
 
 4
 Plaintiffs Bassett and Waszkowski were recalled to work by Glendenning in January 1982, but were again laid off, this time along with plaintiff Kesner, in February 1982. The plaintiffs filed numerous letters and grievances with Local 705 officials and others protesting Glendenning's subcontracting of work to Metro. Over a period of about six months, Local 705 repeatedly refused to consider any grievances raising the subcontracting issue on the grounds that the matter had already been resolved to the union's satisfaction and that the grievants had failed to provide evidence of any continuing subcontracting violations. At some point during this period, a dispute also developed between the plaintiffs and the union over whether, as Local 705 contended, a portion of the work subcontracted to Metro was being performed outside of Local 705's jurisdictional boundaries, and thus was not subcontracted in violation of the JACA.
 
 
 5
 In September 1982, Local 705 consolidated the plaintiffs' grievances with others alleging subcontracting violations and processed these grievances to the JGC. The JGC held hearings in October and November 1982 during which it ordered Glendenning to produce various documents relevant to the grievances, and ordered Local 705 to select an auditor to review Glendenning's records. Local 705 hired two auditors and instructed them to examine Glendenning's records to determine the amount of work that was subcontracted to Metro between November 1981 and October 1982. Local 705 also told the auditors, however, not to consider any work that was performed outside of its jurisdictional boundaries as defined by the union. The auditors then compiled a report that Local 705 concluded was accurate, but that the plaintiffs and several other employees decided was an underestimate of the amount of work that was illegally subcontracted to Metro. The report was presented to the JGC at a hearing on February 9, 1983, and the JGC voted to accept the report as an accurate reflection of the volume of work performed in violation of the JACA. Nevertheless, after approving the auditors' report, the JGC deadlocked over the amount that Glendenning should pay in final settlement of the grievances.
 
 
 6
 The plaintiffs initiated the present action on March 22, 1983, originally naming both Local 705 and Glendenning as defendants. Glendenning filed for bankruptcy in April 1983, however, and was ultimately dismissed as a party on plaintiffs' motion. In July 1983, Local 705 moved for judgment on the pleadings under FED.R.CIV.P. 12(c), contending that the court lacked subject matter jurisdiction because of the plaintiffs' failure to exhaust internal union remedies. In support of this motion, Local 705 stated that plaintiffs had neglected to file charges with the union raising their claim that Local 705 had breached its duty of fair representation, notwithstanding the fact that the Teamsters Union constitution provided an internal procedure for the adjudication of such charges by a neutral union tribunal.
 
 
 7
 The plaintiffs responded to Local 705's motion by arguing, among other things, that exhaustion was unnecessary in this case because (1) internal union remedies would have been inadequate to afford plaintiffs the full relief they sought judicially, including their reinstatement to employment, and (2) exhaustion of such remedies would have been futile because of union hostility toward the plaintiffs. Local 705 answered plaintiffs' arguments in its reply brief on the Rule 12(c) motion by first conceding that in light of plaintiffs' request for reinstatement to employment, internal union remedies could not have afforded plaintiffs full relief. Rather, Local 705 explained, its position was that these remedies were adequate in the sense that they could have "reactivated" plaintiffs' grievances under the principles of the Supreme Court's decision in Clayton v. International Union, UAW, 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981). As to plaintiffs' argument that exhaustion would have been futile, Local 705 joined issue by pointing to various procedures in the Teamsters constitution aimed at insuring the neutrality of the union tribunal that would have adjudicated the plaintiffs' charges.
 
 
 8
 The district court issued a memorandum decision denying Local 705's motion on October 25, 1983. With respect to the adequacy of internal union remedies, the district court noted our decisions in Tinsley v. United Parcel Service, Inc., 635 F.2d 1288, 1290 & n. 4 (7th Cir.) ("Tinsley I "), vacated, 452 U.S. 934, 101 S.Ct. 3072, 69 L.Ed.2d 949 (1981), reaff'd after remand, 665 F.2d 778, 780 (7th Cir.1981) ("Tinsley II "), wherein we found that the remedies available under the Teamsters Union constitution were adequate in that case to make the plaintiffs whole by providing them with compensatory damages. The district court then stated that "[u]pon that assumption"--that compensatory damages could be obtained by means of internal union procedures--"we too consider the remedy provided by the Teamsters constitution to be adequate." The district court devoted the bulk of its analysis to the plaintiffs' allegation that exhaustion of union remedies would have been futile, and ultimately concluded that Local 705 had failed to disprove this allegation sufficiently to justify ruling in its favor on the pleadings.
 
 
 9
 After approximately six months of discovery and trial preparation, Local 705 filed a motion for summary judgment on April 30, 1984. As grounds for this motion, Local 705 again asserted, among other things, that the court lacked jurisdiction because of plaintiffs' failure to exhaust. This time the district court accepted Local 705's exhaustion argument and granted summary judgment in the union's favor in a memorandum order dated July 16, 1984. The district court in this decision did not further discuss the adequacy of Teamsters remedies to provide full relief or reactivate plaintiffs' grievances, but rather focused on the plaintiffs' claim that exhaustion would have been futile. In light of the additional evidence that Local 705 had provided to show the nature of the particular remedies that were available to the plaintiffs under the Teamsters constitution, the court found that resort to these remedies would not have been futile.
 
 
 10
 The plaintiffs now appeal this award of summary judgment, claiming (1) that Teamster Union remedies were inadequate either to grant them full relief or to reactivate their grievances, (2) that exhaustion of these remedies would have been futile, (3) that they reasonably attempted to exhaust union remedies by filing numerous written appeals with Local 705 and Teamsters Union officials, and (4) that the district court's summary judgment ruling on exhaustion grounds was contrary to the law of the case established in its first ruling on the Rule 12(c) motion. Because we agree with the plaintiffs' first argument and find it to be dispositive, we need not discuss the others.
 
 II.
 
 11
 The Supreme Court set forth the pertinent principles governing when an employee should be required to exhaust internal union remedies before bringing a section 301 suit against his union for breach of its duty of fair representation in Clayton v. International Union, UAW, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). After reviewing at length the various policies underlying an exhaustion requirement, see id. at 685-89, 101 S.Ct. at 2093-2094, the Court concluded that "courts have discretion to decide whether to require exhaustion of internal union procedures," id. at 689, 101 S.Ct. at 2095, and that:
 
 
 12
 In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under Sec. 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.
 
 
 13
 Id. at 689, 101 S.Ct. at 2095. The Court in Clayton applied the second of these factors, concluding that the plaintiffs-employees in that case were not required to exhaust internal union procedures because these procedures could not have resulted in either reactivation of the plaintiffs' grievance or an award of complete relief. Id. at 685, 101 S.Ct. at 2093.
 
 
 14
 The Court explained that: "When internal union appeals procedures can result in either complete relief to an aggrieved employee or reactivation of his grievance, exhaustion would advance the national labor policy of encouraging private resolution of contractual labor disputes. In such cases, the internal union procedures are capable of fully resolving meritorious claims short of the judicial forum." Id. at 692, 101 S.Ct. at 2096. With specific reference to the reactivation of a plaintiff's grievance, the Court stated that when such a remedy is available, the policies underlying the Court's decision in Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), come into play. Clayton, 451 U.S. at 692, 101 S.Ct. at 2096. The Court held in Republic Steel that an employee must exhaust any exclusive grievance and arbitration procedures provided by the collective-bargaining agreement between his union and his employer before maintaining a suit against his union or employer for breach of that agreement. 379 U.S. at 652-53, 85 S.Ct. at 616. The court accordingly held in Clayton that when exhaustion of internal union remedies could result in reactivation of the plaintiffs' grievance within the framework of such a collective-bargaining agreement, exhaustion would be required. 451 U.S. at 692, 101 S.Ct. at 2096. Applying these principles to the facts presented in Clayton, the Court found exhaustion unnecessary because (1) the internal procedures provided by the plaintiffs' union could not order them reinstated as employees, and thus could not provide them with the full relief they sought in their section 301 action, id. at 690-91, 101 S.Ct. at 2095-96, and (2) the time for the plaintiffs' union to demand arbitration of their grievances under the procedures provided for in the collective-bargaining agreement had already run before the plaintiffs were notified of the union's prior decision not to pursue these grievances, and thus internal union procedures could not have served to reactivate plaintiffs' grievances within the framework of that agreement, id. at 691, 101 S.Ct. at 2096.
 
 
 15
 The issue in the present case is not whether the internal union remedies provided by the Teamsters constitution were adequate to afford plaintiffs all the relief they are now seeking in this section 301 action, but rather whether these remedies could have reactivated plaintiffs' grievances under the principles of Clayton. Indeed, as Local 705 conceded both below and on appeal, Teamsters Union remedies, like the internal union procedures at issue in Clayton, could not have afforded complete relief to the plaintiffs in light of their request for reinstatement to employment with Glendenning. This factor distinguishes the instant case from our prior decisions upholding the adequacy of Teamsters Union remedies in Tinsley I and Tinsley II, because the section 301 complaint at issue in those decisions sought only monetary damages, not reinstatement. See Tinsley II, 665 F.2d at 780; Tinsley I, 635 F.2d at 1290 n. 5. Local 705 instead claims, as it did below, that Teamsters Union procedures could have resulted in the "reactivation" of plaintiffs' grievances within the meaning of Clayton. Since the JGC deadlocked on the remedial portion of plaintiffs' grievances against Glendenning, Local 705 reasons, the JACA gave the union the right to sue or strike Glendenning to obtain a proper remedy. By following union procedures, Local 705 claims that the plaintiffs might have thereby persuaded the union to initiate a strike or lawsuit against Glendenning.
 
 
 16
 We cannot accept this argument. First, its premise--that a union's initiation of a strike or lawsuit against a plaintiff's employer constitutes reactivation of that plaintiff's grievance within the framework of the relevant collective-bargaining agreement--is of questionable validity. The Court's discussion of reactivation in Clayton is directed exclusively to the situation where a union can resubmit the plaintiff's grievance to some kind of "collectively bargained dispute-resolution procedures." 451 U.S. at 692, 101 S.Ct. at 2096-97. See also Schultz v. Owens-Illinois, Inc., 696 F.2d 505, 513-14 (7th Cir.1982); Miller v. General Motors Corp., 675 F.2d 146, 148-49 (7th Cir.1982). It is difficult to conceive of a strike or a lawsuit, even when such actions are permitted by the collective-bargaining agreement, as the kind of dispute-resolution procedures contemplated by the Court in Clayton. Further, it is not evident that "exhaustion would advance the national labor policy," 451 U.S. at 692, 101 S.Ct. at 2096-97, when the most that a plaintiff could hope to achieve through such exhaustion is a strike or another lawsuit against his employer.
 
 
 17
 Nevertheless, we need not decide in this case whether the possibility of a strike or another lawsuit may ever be deemed a reactivation of an employee's grievance for exhaustion purposes under Clayton. Even assuming that Local 705's general premise is correct, its contention fails because Local 705 had no right under the JACA to bring a suit or strike against Glendenning on the majority of plaintiffs' grievances. Despite its deadlock on the question of the exact amount owed by Glendenning as a result of its subcontracting violations, the JGC did render a final decision by majority vote approving the auditor's report on the extent of these violations. By embracing the auditor's report, the JGC rejected the plaintiffs' significantly larger estimate of Glendenning's violations. Hence, given the binding nature of the JGC decision under the JACA, Local 705 could not have fully "reactivated" the plaintiffs' grievances even by means of a strike or lawsuit.
 
 
 18
 Local 705 finally asserts that plaintiffs should have been required to exhaust Teamsters remedies because they might thereby have been persuaded that their grievances were meritless. In particular, Local 705 claims that an internal union tribunal might have convinced plaintiffs to accept Local 705's position that much of the work subcontracted by Glendenning was performed outside of Local 705's jurisdictional boundaries, and therefore did not violate the JACA. The mere speculation that internal union procedures could lead the plaintiff to abandon a grievance is not, however, sufficient to require exhaustion of such procedures under Clayton. In deciding not to adopt a universal exhaustion requirement in Clayton, the Court rejected an argument nearly identical to Local 705's:
 
 
 19
 Concededly, a requirement that aggrieved employees exhaust internal remedies might lead to nonjudicial resolution of some contractual grievances. For example, an employee who exhausts internal union procedures might decide not to pursue his Sec. 301 action in court, either because the union offered him a favorable settlement, or because it demonstrated that his underlying contractual claim was without merit. However, we decline to impose a universal exhaustion requirement lest employees with meritorious Sec. 301 claims be forced to exhaust themselves and their resources by submitting their claims to potentially lengthy internal union procedures that may not be adequate to redress their underlying grievances.
 
 
 20
 451 U.S. at 689, 101 S.Ct. at 2095.
 
 
 21
 Because Teamsters' remedies were inadequate either to provide plaintiffs complete relief, as Local 705 concedes, or to reactivate plaintiff's grievance within the framework of the JACA, as our analysis has led us to conclude, we must hold that plaintiffs were not required to exhaust these remedies as a predicate to maintaining a section 301 suit.
 
 III.
 
 22
 For these reasons, the district court's order granting summary judgment to Local 705 and dismissing plaintiffs' claims is REVERSED and REMANDED for further proceedings consistent with this opinion. Rule 18 shall not apply on remand.
 
 
 
 *
 The Honorable John W. Peck, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, is sitting by designation